PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 21, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-14896

_____

D.C. Docket No. 99-00262-CV-CAP-1

SPENCER WADDELL,

Plaintiff-Appellant,

versus

VALLEY FORGE DENTAL ASSOCIATES, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(December 21, 2001)**

Before BIRCH, MARCUS and WOOD[*], Circuit Judges.
BIRCH, Circuit Judge:

_____

[*]Honorable Harlington Wood, U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

Spencer Waddell appeals the district court's order granting summary judgment to the defendant, Valley Forge Dental Associates, Inc., on his discrimination claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq. This case requires us to decide whether the district court properly held that Waddell, an HIV-positive dental hygienist, was not otherwise qualified for his employment position because he posed a direct threat to his patients. We AFFIRM.

## I. BACKGROUND

Waddell, a dental hygienist licensed by the State of Georgia, was employed by Dr. Eugene Witkin from early 1996 until October 1997. In February 1997, Valley Forge took over Witkin's practice. Under this agreement, Witkin and his employees became Valley Forge's employees.[1] Waddell's primary responsibility as a dental hygienist for both Witkin and Valley Forge was the performance of routine prophylaxis, or, in lay terms, the cleaning of teeth.

In September 1997, Dr. Sourignamath Bhat administered a test to Waddell to determine whether he carried the human immunodeficiency virus ("HIV"). Waddell's test results indicated that he was HIV-positive. Bhat telephoned Witkin

---

[1]Subsequent to Waddell's disassociation from the practice, Monarch Dental Associates acquired Valley Forge and became its successor-in-interest. For the sake of convenience, we will refer to the Defendant-Appellee as "Valley Forge."

to inform him of Waddell's test results, and Witkin in turn alerted Jill Whelchel, a dental hygienist and administrator at Valley Forge, to Waddell's status. Whelchel contacted Jean Welsko in Valley Forge's Human Resources Department and sought advice on how to handle the situation. On Welsko's suggestion, Witkin and Whelchel met with Waddell and put him on paid leave until the three of them could decide what action should be taken. During the next week, Witkin studied his stockpile of dental journals to glean information about the transmission of HIV in the dental context. The Centers for Disease Control and Prevention ("CDC") also was consulted concerning the risk of transmission. Witkin and Whelchel then met with Waddell again and told him that he could no longer treat patients because of his HIV-positive status. They offered Waddell a clerical job at the front desk at roughly half of the salary he had made as a dental hygienist. Waddell took another week off to consider the proposition, and when he ultimately refused to accept the offered job at the offered rate of pay, Valley Forge terminated his employment.

Waddell brought this suit against Valley Forge, seeking relief under the ADA, the Rehabilitation Act, and various Georgia statutory provisions. After conducting discovery, both Waddell and Valley Forge moved for summary judgment. The issues on the ADA claim were limited by the fact that Valley Forge admitted that its decision to remove Waddell from his position as a dental hygienist

was based solely on his HIV-positive status. The bulk of the evidence presented in support of the summary judgment motions addressed the question of whether Waddell's HIV-positive status made him a direct threat to dental patients, which would preclude him from demonstrating that he was qualified to perform the duties of a dental hygienist. See 42 U.S.C. § 12113(b). The district court found that Waddell's job entailed "exposure-prone" procedures as that term has been defined by the CDC, and that the necessity of performing the procedures made Waddell a direct threat under the standard we set forth in Onishea v. Hopper, 171 F.3d 1289, 1299 (11th Cir. 1999) (en banc). Consistent with this finding, the district court denied Waddell's motion for summary judgment and instead granted summary judgment in favor of Valley Forge.[2] Waddell appeals the district court's ruling on both summary judgment motions.

## II. DISCUSSION

We review the district court's decision to grant summary judgment de novo, and in so doing we apply the same legal standards that were applicable in the trial court. See Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir.

---

[2]The district court granted summary judgment for Valley Forge on Waddell's Rehabilitation Act claim on the ground that Waddell had produced no evidence that Valley Forge receives financial assistance from the federal government. Having granted Valley Forge summary judgment on all of Waddell's federal claims, the district court declined to exercise pendent jurisdiction over Waddell's state-law claims.

4

1999). "Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 (11th Cir. 1996); see also Fed. R. Civ. P. 56(c). There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor. Patterson & Wilder Constr. Co. v. United States, 226 F.3d 1269, 1273 (11th Cir. 2000).

In order to establish a prima facie case of discrimination under the ADA, Waddell "must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000); see also 42 U.S.C. § 12112(a).[3] As they did in the district court, the parties on appeal focus their arguments on whether Waddell is a qualified individual under § 12112(a).[4] Specifically, the

[3]Waddell appeals the summary judgment on his Rehabilitation Act claim on the same grounds that he appeals the summary judgment on his ADA claim. The district court, however, granted summary judgment on the two claims for different reasons. Because Waddell does not address the district court's rationale for granting summary judgment on his Rehabilitation Act claim, we deem his appeal on that issue waived. In any event, because we evaluate claims brought under the Rehabilitation Act and the ADA under the same standards, Sutton v. Lader, 185 F.3d 1203, 1207-08 n.5 (11th Cir. 1999), our conclusion that Waddell is not otherwise qualified for his employment position is fatal to both his Rehabilitation Act and ADA claims.

[4]Valley Forge also argues that Waddell has failed to establish that he is disabled because his asymptomatic HIV does not substantially limit one of his major life activities and because HIV is not a disability per se . See 42 U.S.C. § 12102(2)(A). Waddell alleges in his pleadings that HIV has substantially limited his intimate and sexual relationships, his participation in

5

parties debate whether the risk of Waddell transmitting HIV to a patient in the course of treatment poses a direct threat to others in the workplace. See 42 U.S.C. § 12111(3). Waddell carries the burden of establishing that "he was not a direct threat or that reasonable accommodations were available." LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 836 (11th Cir. 1998). If he cannot meet this burden, he is not a qualified individual and therefore cannot establish a prima facie case of discrimination.

The term "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Addressing this issue, the Supreme Court explained in School Board of Nassau County v. Arline that "[a] person who poses a significant risk of

societal and community life, his ability to plan his life and care for himself, and his ability to travel. Even if we assume that these constitute major life activities, we cannot determine whether Waddell is substantially limited as to any of these, given that we have before us such a skeletal record on the issue.

As to the disability per se issue, we recognize that some of our past cases suggest in dicta that HIV should be treated as a per se disability. See, e.g., Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1445 n.5 (11th Cir. 1998). We note, however, that in Bragdon v. Abbott, the Supreme Court declined to address whether asymptomatic HIV is a per se disability, arguably suggesting, at least implicitly, that the preferred method is to address whether an impairment causes a substantial limitation upon a major life activity on a case-by-case, individualized basis. 524 U.S. 624, 641-42, 118 S. Ct. 2196, 2207 (1998). Two recent cases further demonstrate that the Supreme Court favors an individualized analysis. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 119 S. Ct. 2162 (1999); Sutton v. United Airlines, Inc., 527 U.S. 471, 119 S. Ct. 2139 (1999). Nevertheless, we need not address whether Waddell is disabled, either on the theory that he is substantially limited in a major life activity or on the theory that HIV is a disability per se. Because we agree with the district court that Waddell is not a qualified individual under the ADA, we do not reach the disability issue.

6

communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk." 480 U.S. 273, 287 n.16, 107 S. Ct. 1123, 1131 n.16 (1987). To determine whether an employee who carries an infectious disease poses a significant risk to others, the Supreme Court has stated that courts should consider several factors, which include:

> [findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk, (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.

Id. at 288, 107 S. Ct. at 1131 (citation omitted). The Supreme Court also has indicated that an employer in the medical field, "[a]s a health care professional, . . . ha[s] the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession," Bragdon, 524 U.S. at 649, 118 S. Ct. at 2210, and that his employment decision concerning an infected employee must be "reasonable in light of the available medical evidence," irrespective of whether his decision was made in good faith, id. at 650, 118 S. Ct. at 2211. See also Lowe v. Alabama Power Co., 244 F.3d 1305, 1308 (11th Cir. 2001) (noting "that a good-faith belief that a significant risk of harm exists is

7

insufficient if it is not grounded in medical or other objective, scientific evidence").

We have not had occasion to apply the significant risk analysis enunciated in Arline and Bragdon to a case involving an HIV-positive employee in the medical field, as is the situation here. In Onishea, however, even though the facts did not involve an employee in the medical field, the disability at issue was HIV infection, and in that case we elaborated on the meaning of "significant risk," holding that "when transmitting a disease inevitably entails death, the evidence supports a finding of 'significant risk' if it shows both (1) that a certain event can occur and (2) that according to reliable medical opinion the event can transmit the disease." 171 F.3d at 1299. We noted that "when the adverse event is the contraction of a fatal disease, the risk of transmission can be significant even if the probability of transmission is low: death itself makes the risk 'significant.'" Id. at 1297. Moreover, we emphasized that although the "asserted danger of transfer must be rooted in sound medical opinion and not be speculative or fanciful[,] . . . this is not a 'somebody has to die first' standard, either: evidence of actual transmission of the fatal disease in the relevant context is not necessary to a finding of significant risk." Id. at 1299.

Applying these principles to the case at hand, we conclude that the record establishes that the district court properly granted summary judgment to Valley Forge because an HIV-infected dental hygienist like Waddell poses a significant risk of HIV transmission to his patients. The district court concluded that Waddell posed a significant risk based on the two-part test we delineated in Onishea, 171 F.3d at 1299. The court found that a certain event could occur — a dental hygienist like Waddell could cut or prick his finger while performing a procedure in a patient's mouth, and the hygienist's blood then could come into contact with an oral cut or abrasion. The court also found that the procedures used to clean teeth were "exposure- prone" based on the CDC definition of that term,[5] and therefore that reliable medical opinion indicated that if the certain event occurred, Waddell could expose a patient to HIV.

---

[5]In 1991, the CDC issued a set of recommendations for management of healthcare workers infected with HIV or Hepatitis B. With reference to exposure-prone procedures, the recommendations state:

> Characteristics of exposure-prone procedures include . . . the simultaneous presence of the HCW's [healthcare worker's] fingers and a needle or other sharp instrument or object in a poorly visualized or highly confined anatomic site. Performance of exposure-prone procedures presents a recognized risk of percutaneous injury [skin piercing] to the HCW, and – if such an injury occurs — the HCW's blood is likely to contact the patient's body cavity, subcutaneous tissues, and/or mucous membranes.

Centers for Disease Control and Prevention, Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure-Prone Invasive Procedures, Morbidity & Mortality Weekly Report 4 (1991) (R2-18 Exh. J).

In reaching these conclusions, the district court considered the four factors laid down in Arline, 480 U.S. at 288, 107 S. Ct. at 1131.  As to the first factor, the nature of the risk, the district court found that HIV is transmitted when infected blood or other bodily fluids come into contact with the blood, mucous membrane, or other fluids of another person.  Neither party on appeal contests this issue, and both parties agree that any risk of HIV transmission in the dental setting would arise from contact between Waddell's blood and an open wound or mucous membrane of a patient.

As to the second factor, the duration of the risk, the court found that HIV infection is indefinite because there is no cure for HIV at this time.  Again, both parties agree on this point.  As to the third factor, the severity of the risk to third parties, the court found that the potential harm to a person infected is eventual death.  Although in this litigation Waddell attempted to downplay the effects of HIV infection on the individual, the court's conclusion on this point appears incontrovertible, especially since Waddell himself admits that there is no current cure for HIV infection.  See also Bragdon, 524 U.S. at 633-37, 118 S. Ct. at 2203-04 (discussing the unalterable and catastrophic consequences of HIV infection on the individual).

At the heart of this case, however, is the district court's analysis of the fourth factor delineated in Arline, the probability of HIV transmission between a dental hygienist and patient. The court noted that because Waddell performed some procedures that entailed the use of sharp instruments, there was a risk that he could cut or prick himself and bleed into an open wound or abrasion in the patient's mouth. Although the court determined that the likelihood of transmission from a healthcare worker to a patient was low, the court found that there was a sound, theoretical possibility that Waddell could transmit HIV to a patient. For this reason, the court concluded that based on our definition of significant risk in Onishea, 171 F.3d at 1299, Waddell posed a direct threat to patients at his workplace and thus was not a qualified individual under the ADA.

Even though Waddell and his experts downplay the procedures Waddell had to perform as a dental hygienist and argue that these procedures are not exposure-prone, we agree with the district court's analysis for several reasons. The uncontroverted evidence establishes that dental cleaning procedures involve the use of sharp objects. In his deposition, Waddell noted that a normal teeth cleaning entailed the performance of "scaling" and "root planing" on the patient. Scaling involves the removal of material from teeth at points above the gumline, and root planing involves the removal of material below the gumline. One of Waddell's

medical experts, Dr. Donald Marianos, indicated that scaling involves the use of a sharp instrument. For the root-planing procedure, Waddell stated that he would use "a dental instrument designed with a single blade to cut towards [the] working surface." Waddell Dep. at 29 (R4-34).

The unrebutted evidence also shows that during routine procedures like scaling and root planing, blood of the patient is commonly present. Waddell, in his own deposition, noted that during the scaling procedure, the patient's blood was present in "most" cases. Id. at 28. He noted that during the root-planing procedure, "there should always be" blood of the patient present. Id. at 29. Indeed, in his appellant brief, Waddell acknowledges that "patient bleeding during a routine dental checkup is a common experience." Appellant Br. at 33.

The combination of sharp instruments used by the hygienist and a patient's blood commonly being present indicate that the hygienist could cut or prick himself with such an instrument, pierce the skin of his protective glove, and transfer his blood into the patient's mouth, where it would come into contact with an oral cut or abrasion. In fact, the uncontroverted evidence establishes that a dental worker sometimes does stick or cut himself or herself during treatment. For instance, Waddell related that one time when he was performing scaling work on a patient, he turned away from the patient to replace the scaler tip. The scaler tip

12

broke and scratched his skin, and he had to take a break to ensure that the bleeding had stopped and to bandage the site. Valley Forge dental hygienist and administrator, Whelchel, also told in her deposition of an incident that occurred when she was cleaning teeth. She stated that while she was using an instrument on a patient, the tip cut the skin of her finger, which was inside the patient's mouth and near the tongue.

It is true that there is some dispute between the parties as to how often a dental hygienist's fingers are present in a patient's mouth at the same time as sharp instruments. Waddell's own objective medical evidence on this point, however, indicates that a hygienist's fingers are in a patient's mouth along with a sharp instrument at least some of the time. For example, Dr. Marianos, one of Waddell's medical experts, stated that a hygienist's fingers and dental instruments are "rarely," in the patient's mouth at the same time. Marianos Aff. at 5 (R3-27). By negative implication, of course, Marianos's statement suggests that at least in some instances, both finger and instrument are in the patient's mouth simultaneously.

In addition, it is important to note that Waddell and his experts in fact acknowledge that there is a possibility of blood-to-blood contact between hygienist and patient, irrespective of precisely how often a hygienist's fingers are in a patient's mouth alongside a sharp instrument. For instance, while Waddell notes in

13

his appellant brief that the exposure of a patient to HIV will not occur during routine procedures, he concedes that "[p]ercutaneous . . . injuries resulting in blood-to-blood contact theoretically provide opportunities for transmission." Appellant Br. at 36.  None of Waddell's medical experts, moreover, appear to dispute that transmission theoretically could happen, even though the risk is small and such an event never before has occurred.  This is enough to constitute a significant risk under Onishea, given that HIV has catastrophic effects and is inevitably fatal if transmitted to a patient.  In Onishea, we agreed with the Fourth, Fifth, and Sixth Circuits that:

> a showing of a specific and theoretically sound means of possible transmission [is] enough to justify summary judgment against an HIV-positive plaintiff on the ground that the infection pose[s] a 'significant risk' to others in the workplace, even though reported incidents of transmission [are] few or nonexistent, and the odds of transmission [are] admittedly small.

171 F.3d at 1297.  The district court's grant of summary judgment to Valley Forge is consistent with this language because even a small and "theoretically possible method of [HIV] transmission"  from Waddell to a patient — a risk that even Waddell's medical experts acknowledge — can create a significant risk under the ADA because transmission, if it occurs, is fatal.  Id. at 1299.

We also point out that even if there remains some question as to how often Waddell's hand would be in a patient's mouth at the same time as a sharp

14

instrument, Waddell still is unable to refute the assertion that an inadvertent bite or some other accident during a cleaning could lead to the mixture of Waddell's blood with a patient's blood due to an oral cut or abrasion. Indeed, the CDC has noted that with regard to dentistry, "trauma," in one form or another, "to health-care workers' hands is common." Centers for Disease Control and Prevention, Update: Universal Precautions for Prevention of Transmission of Human Immunodeficiency Virus, Hepatitis B Virus, and Other Bloodborne Pathogens in Health-Care Settings, Morbidity & Mortality Weekly Report 379 (1988) (R2-18 Exh. K). For example, a child patient (or even an adult) could bite down on a hygienist's finger in a moment of fear, pain, anger, or surprise, causing blood to be transmitted into the child's (or adult's) mouth. Waddell himself, in fact, acknowledged in his deposition that he had heard of dental hygienists who had been bitten by patients.

In summary, several factors, when taken together, indicate that Waddell poses a significant risk to others in the workplace: the use of sharp instruments by dental hygienists; routine patient bleeding during dental work; the risk that hygienists will be stuck or pricked while using an instrument; the statements of Waddell and medical his experts acknowledging that there is some risk, even if theoretical and small, that blood-to-blood contact between hygienist and patient

15

can occur; and the possibility of an inadvertent bite or other accident during a dental cleaning.  These "particularized facts" provide "the best available objective evidence" that Waddell, because he is infected with the fatal, contagious disease of HIV, is a direct threat to his workplace, and therefore not a qualified individual under the ADA.  Lowe, 244 F.3d at 1309.

## III.  CONCLUSION

In this appeal, Waddell has argued that the district court erred in denying his motion for summary judgment on his claims under the ADA and the Rehabilitation Act and in granting Valley Forge's summary judgment motion.  We have decided that the district court was correct in finding that there was no genuine issue of material fact and that Valley Forge was entitled to judgment as a matter of law on the issue of whether Waddell was a qualified individual.  Waddell never controverted the fact that if a certain event occurred — a cut or abrasion to the finger of Waddell while performing dental procedures in a patient's mouth caused by a sharp instrument, an inadvertent bite, or some other accident — there was a specific, theoretically sound possibility of transmission.  Because there was such a possibility of transmission, the risk involved, in light of Onishea, was significant due to the fatal nature of HIV.  Accordingly, we AFFIRM.

16