194 F.Supp.2d 1378 (2002)
Alexander FEDOROV, Plaintiff,
v.
The BOARD OF REGENTS FOR THE UNIVERSITY OF GEORGIA d/b/a Medical College of Georgia; Randy Butterbaugh, in his official and individual capacity as an employee of Medical College of Georgia; David Myers, in his official and individual capacity as an employee of Medical *1379 College of Georgia; Barry Goldstein, in his official and individual capacity as an employee of Medical College of Georgia; James Puryear, in his official and individual capacity as an employee of Medical College of Georgia; Arthur Croft, in his official and individual capacity as an employee of Medical College of Georgia; Hammond Story, in his official and individual capacity as an employee of Medical College of Georgia; Mitch Jones, in his official and individual capacity as an employee of Medical College of Georgia; and John Does, in their official and individual capacities as employees of Medical College of Georgia, Defendants.
No. CV 101-011.
United States District Court, S.D. Georgia, Augusta Division.
March 29, 2002.
*1380 *1381 Mark E. Robinson, Denise Danielle Van-Landuyt, Devlin & Robinson, Atlanta, GA, for Plaintiff.
B. Patricia Downing, John C. Jones, Devon Orland, State Law Dept., Atlanta, GA, for Defendants.

ORDER
BOWEN, Chief Judge.
Defendants have moved for summary judgment. In response, Plaintiff requests a continuance to conduct further discovery. For reasons stated below, Plaintiff's motion is DENIED, and Defendants' motion is GRANTED.

I. Introduction
Beginning in 1995, Plaintiff Alexander Fedorov attended dental school at the Medical College of Georgia in Augusta. Defendant Board of Regents for the University System of Georgia oversees the Medical College of Georgia (MCG), and I will refer to these entities interchangeably. The individual defendants work in the dental school's administration.
In 1999, Plaintiff was dismissed from the dental school for alleged violations of MCG's student policies. Specifically, Defendants claimed Plaintiff falsified his insurance form, and used and possessed controlled narcotics. Plaintiff subsequently applied for readmission. His application was denied. Plaintiff then brought this lawsuit claiming his dismissal violated various federal and state laws. Defendants seek summary judgment on all of Plaintiff's claims.

*1382 II. Factual Background
As a dental student, Plaintiff performed well. He achieved passing grades in his classes and clinics and made the Dean's List. (Pl.Aff.¶ 3.) Plaintiff also passed the national dentistry boards in the fall of 1998. (Id. ¶ 4.)
In September 1998, the University Police contacted Defendant Randy Butterbaugh about Plaintiff. Butterbaugh is the Director of Student Affairs for the Medical College of Georgia. (Butterbaugh Aff. ¶ 4.) The police allegedly received information from federal law enforcement regarding Plaintiff's purported involvement in trafficking narcotics. (Id.) According to Butterbaugh, he was advised that Plaintiff's brother was detained at the United States Mexican border attempting to smuggle illegal drugs into the United States. (Id. ¶ 5.) Butterbaugh claims he was informed that Plaintiff directed his brother to obtain the drugs. (Id.)
On October 5, 1998, the University Police went to Plaintiff's apartment and confronted him about the allegations. Plaintiff consented to a search of his apartment. (Pl.Aff.¶ 6.) The police found controlled substances. (Butterbaugh Aff. ¶ 6.) With one exception, Plaintiff claims he had legally acquired the drugs. (Pl.Aff.¶ 6.) The exception was a single hydrocone pill. (Id.) Plaintiff maintains that this item did not belong to him and that he was unaware of its presence in his apartment. (Id.) Plaintiff also contends that neither cocaine nor Xanex were found in his apartment. (Pl.Aff.¶ 7.)
Afterwards, Butterbaugh confronted Plaintiff about the allegations and the search. Plaintiff allegedly admitted that he was using the substances found in his apartment, minus the hydrocodone pill. (Butterbaugh Aff. ¶ 7; Pl. Aff. ¶ 7.) Apparently, Plaintiff also admitted to using other controlled substances. (See Butterbaugh Aff. ¶¶ 6-7; Pl. Aff. ¶ 7.)
Plaintiff allegedly requested and received a medical leave of absence to enter a drug rehabilitation program. (Butterbaugh Aff. ¶ 8.) Plaintiff's treatment began on October 7, 1998. (Pl.Aff.¶ 9.) Dr. Scott Balogh provided the medical care. (Id. ¶ 9.) Butterbaugh claims he assisted Plaintiff in obtaining this treatment after their initial confrontation. (Pl. Aff. ¶ 9; Butterbaugh Aff. ¶ 7.) Nevertheless, Butterbaugh contends he expressly reserved the right to discipline Plaintiff. (Butterbaugh Aff. ¶ 8.)
Plaintiff, on the other hand, claims he voluntarily entered the treatment program. (Pl.Aff.¶ 9.) Dr. Jill Miller allegedly referred Plaintiff to Dr. Balogh. (Id.) Dr. Miller serves as MCG's Director of Student Health. (Id.) Plaintiff further maintains that he entered into a written recovery contract with Dr. Balogh and Dr. Miller. (Id. ¶ 10.) Under this alleged contract, Plaintiff was supposed to receive "the necessary help and support for a complete recovery from [his] addictions." (Id.) More importantly, the contract purportedly allowed Plaintiff to continue his studies until his scheduled graduation date in May 1999.
Shortly after Plaintiff was referred for rehabilitation, the parties discovered that Plaintiff's health insurance had lapsed. (Id. ¶ 11; Butterbaugh Aff. ¶ 9.) MCG's policy requires students to maintain valid health insurance. (Butterbaugh ¶ 10.) Each year, a student must sign a written certification to verify current insurance. (Id. ¶ 11.) According to Butterbaugh, Plaintiff certified that he had valid insurance and subsequently allowed it to lapse. (Id. ¶ 11.)
Plaintiff claims the lapse was unintentional. (Pl.Aff.¶ 11.) Plaintiff further contends that Defendant Butterbaugh assisted him in acquiring temporary coverage. (Id. ¶ 12.) At the time, Butterbaugh purportedly *1383 failed to mention any violation of MCG's policies. (Id.)
On November 24, 1998, Butterbaugh sent Plaintiff a letter charging him with student code violations. (Butterbaugh Aff. Ex. A.) When the letter was sent, Plaintiff was participating in a drug rehabilitation program. (Id. ¶ 13; Pl. Aff. ¶ 13.) At the time, Plaintiff claims he had also stopped using drugs and had returned to class. (Id. ¶¶ 14-15.) According to Plaintiff, his return to class was conditioned upon negative drug screens and progress in his treatment. (Id. ¶ 14.)
The charges stemmed from Plaintiff's drug use and alleged falsification of official documents. (Butterbaugh Aff. Ex. A.) Among other substances, Defendants accused Plaintiff of using and possessing cocaine, hydrocodone, and Xanex. (Id.) The falsification charge was based on Plaintiff's insurance certification form for the 1998-99 school year. (Id.) Plaintiff faced expulsion, dismissal, or suspension if found guilty of any one of these charges. (Id.)
The November 24 letter also advised Plaintiff of his rights. (Id.) Plaintiff had the right to remain silent. (Id.) If he wished to defend himself, Plaintiff could choose a person from the "university" to aid his defense. (Id.) But the letter explicitly stated that this person could not be an attorney. (Id.) Plaintiff also had the right to a hearing. (Id.) The "Student Judicial Committee" would hear the matter, and Defendant Butterbaugh was designated to present the facts for the University. (Id.) According to Plaintiff, Butterbaugh told Dr. Miller before the hearing that the University planned to dismiss Plaintiff. (Pl.Aff.¶ 19.)
The hearing occurred on January 26, 1999. Defendant Butterbaugh claims Plaintiff pled guilty to the charges of drug use and falsification. (Butterbaugh Aff. ¶ 15.) Plaintiff denies this allegation. (Pl. Aff.¶ 20.)
Several witnesses appeared at the hearing. Both Plaintiff and Butterbaugh testified. (Pl.Aff.¶ 21.) The parties brought additional witnesses to support their respective cases. (Id. ¶ 21; Butterbaugh Aff. ¶ 18.) Plaintiff had the opportunity to question the opposing witnesses. According to Butterbaugh, Plaintiff also had a person assisting him. (Butterbaugh Aff. ¶ 17.)
Plaintiff contends Defendants presented no evidence to support the charges. (Pl. Aff.¶ 23.) While testifying, Plaintiff repeated his assertion that the hydrocodone pill did not belong to him and that he had prescriptions for the other substances found in the search. (Id. ¶ 24.) Plaintiff further testified that he had no knowledge of a lapse in his health insurance. (Id. ¶ 26.)
The judicial committee found Plaintiff guilty of the charges. (Butterbaugh Aff. ¶ 20.) The recommended penalty was dismissal with conditional "eligibility to apply for readmission after six months." (Id.) Plaintiff received the terms and conditions of his dismissal in a letter from Butterbaugh dated January 27, 1999. (Id. ¶ 21.) The letter also stated that Plaintiff could appeal the decision. (Id. Ex. B.) Plaintiff alleges that "MCG administrative officials" urged him to refrain from filing an appeal. (Id. ¶ 22; Pl. Aff. ¶ 31.)
Because he did not appeal the judicial committee's findings, MCG dismissed Plaintiff. Prior to his eligibility for readmission, however, a "loaded weapon" was found in Plaintiff's University apartment. (Butterbaugh Aff. ¶ 23.) According to Butterbaugh, Plaintiff admitted he owned the weapon. (Id. ¶ 24.) Possessing a weapon is a violation of MCG's student and housing codes. (Id. ¶¶ 25, 27.)
Defendants also allege that Plaintiff violated the student code two more times. First, Plaintiff allegedly falsified his financial *1384 aid application. (Id. ¶ 28.) According to Butterbaugh, Plaintiff represented that he was living off campus when he was actually living on campus. (Id.) Living off campus qualifies students for more financial aid. Second, Defendants claim Plaintiff forged his mother's signature on official university documents. (Id. ¶ 30.)
After six months passed, Plaintiff applied for readmission. (Id. ¶ 31.) A judicial committee investigated the new charges against Plaintiff. (Id. ¶ 33.) In conjunction with the investigation, a hearing was held on August 3, 1999. (Id. ¶ 35.) At the hearing, Plaintiff testified and had the chance to question witnesses. (Id.) Butterbaugh claims Plaintiff also admitted to the new charges. (Id. ¶ 36.) Eventually, the judicial committee found that Plaintiff committed the alleged violations. (Id. ¶ 37.) Relying upon these findings, the Dean of the School of Dentistry denied Plaintiff's application. (Id. ¶ 38.)
Plaintiff appealed the denial to the President of MCG. After another hearing where Plaintiff once again had the opportunity to be heard, the President upheld the decision. (Id. ¶ 39.) Based upon this series of events, Plaintiff filed suit against Defendants on January 26, 2001.

III. Requirements for Summary Judgment
The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal punctuation and citations omitted).
The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993). If the movant bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the non-moving party." Four Parcels, 941 F.2d at 1438. On the other hand, if the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two waysby negating an essential element of the nonmovant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir.1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.
Ifand only ifthe movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material *1385 issue of fact that precludes summary judgment." Id. Again, how to carry this burden depends on who bears the burden of proof at trial. If the movant has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. If the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Rule 56.
The Clerk has given the non-moving party notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 19.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

IV. Analysis
Plaintiff brings a variety of federal and state-law claims. Against Defendant Board of Regents, Plaintiff asserts claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq., the United States Constitution, the Georgia Constitution, and Georgia statutory and common law. Plaintiff primarily alleges state and federal constitutional violations against the individual defendants.

A. Federal Liability of the Board of Regents and the Individual Defendants in their Official Capacities
Plaintiff contends that Defendant Board of Regents violated the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. In their official capacity, Plaintiff maintains the individual defendants violated his constitutional rights to equal protection and due process.
Because Plaintiff sues the Board of Regents and the individual defendants in their official capacity, this lawsuit raises questions of Eleventh Amendment immunity. The Board of Regents is an agency of the State of Georgia. A suit against a state government employee in his official capacity is treated as a suit against the state. Gamble v. Fla. Dep't of Health & Rehab. Services, 779 F.2d 1509, 1512 (11th Cir.1986). Consequently, these two sets of defendants assert immunity from Plaintiff's claims under the ADA, the Rehabilitation Act, and the United States Constitution. For reasons to follow, I find the State immune from the ADA and constitutional claims but subject to the Rehabilitation Act.

*1386 1. The ADA and Constitutional Claims

Generally, the Eleventh Amendment grants the States immunity from lawsuits in federal court. The Eleventh Amendment declares:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
U.S. Const. amend. XI. Interpretations of this Amendment have extended its application to "suits by citizens against their own states." Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).
A plaintiff may overcome Eleventh Amendment immunity in two ways. First, the State may waive it. Second, Congress may abrogate it. To abrogate immunity, Congress must clearly express an intent to do so and "act pursuant to a valid grant of constitutional authority." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Neither party has argued that the State waived its immunity. The question is whether Congress properly abrogated Eleventh Amendment immunity from suits under the ADA and 42 U.S.C. § 1983. See § 1983 (serving as the vehicle for claims under the United States Constitution against persons acting under color of state law).
Courts have ruled that States enjoy immunity for claims under the ADA and § 1983. Specifically, states are not persons capable of being sued within the meaning of § 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 64, 68, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); see also Quern v. Jordan, 440 U.S. 332, 340-41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (holding that States enjoy Eleventh Amendment immunity from § 1983 claims). With regard to Title II of the ADA, Congress did not make the necessary findings to abrogate Eleventh Amendment immunity. Williamson v. Ga. Dep't of Human Res., 150 F.Supp.2d 1375, 1380-81 (S.D.Ga. 2001); see also Thompson v. Colo., 278 F.3d 1020, 1034 (10th Cir.2001) (holding the same). Accordingly, Defendant Board of Regents enjoys total immunity from Plaintiff's claims under the ADA and § 1983.
The claims against the individual defendants present a more difficult question. In their official capacity, the Eleventh Amendment also bars Plaintiff's claims for damages. Gamble, 779 F.2d at 1512; see also id. (stating that claims for damages against state officers in their official capacity are in effect claims against the State). Under certain circumstances, however, Plaintiff may receive equitable relief against state officers. Fla. Ass'n of Rehab. v. Fla. Dep't of Health, 225 F.3d 1208, 1219 (11th Cir.2000); see Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The doctrine of Ex parte Young provides the basis for this exception to Eleventh Amendment immunity. Under this doctrine, a plaintiff may receive prospective equitable relief against state officers acting in their official capacity. Fla. Ass'n of Rehab., 225 F.3d at 1219. The question is whether Plaintiff seeks prospective or retrospective relief.
Plaintiff's lawsuit presents two problems for applying Ex parte Young. First, Plaintiff seeks redress for an alleged wrong that occurred in the past. "Ex parte Young has been applied in cases where a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past." Id. The alleged discrimination against Plaintiff ended long ago. Plaintiff does *1387 not run the risk of Defendants harming him in the future. Even though Plaintiff attempts to frame his Complaint in equitable terms, the retrospective nature of the relevant events prevents application of Ex parte Young.
The second problem for applying Ex parte Young is related to the first. As relief, Plaintiff requests a declaratory judgment and an injunction. Neither remedy is appropriate in this situation. With regard to a declaratory judgment, Plaintiff's lawsuit falls outside the normal circumstances justifying such relief. A declaratory judgment
gives a means by which rights and obligation may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so.
Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2751 (3d. ed.1998). Because the relevant events have already occurred, Plaintiff may seek a coercive remedy. Additionally, Plaintiff is not anticipating a future lawsuit by Defendants. Under the circumstances presented, Plaintiff may pursue his remedies through traditional, legal means.
Plaintiff's request for injunctive relief also falls outside the scope of Ex parte Young. Prospective relief is awarded to prevent future harm. See Fla. Ass'n of Rehab., 225 F.3d at 1219-20 (discussing prospective relief). Simply because the remedy will occur in the future, does not transform it into "prospective" relief. The term, "prospective relief," refers to the ongoing or future threat of harm, not relief. For these reasons, Plaintiff's request for an injunction reinstating him as a student does not qualify as prospective relief. Accordingly, the individual defendants enjoy Eleventh Amendment immunity in their official capacities.

2. The Rehabilitation Act
Contrary to Defendant Board of Regents' assertions, the States are subject to the Rehabilitation Act. Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees, 276 F.3d 1227, 1229 (11th Cir.2001). Through the receipt of federal funds, the Board of Regents waived its Eleventh Amendment immunity. Id. at 1228;29 U.S.C. § 794.
The Rehabilitation Act forbids public entities from discriminating against a "qualified individual with a disability" on the basis of that person's disability. 29 U.S.C. § 794(a). Because the Rehabilitation Act is identical to the ADA, interpretations of one Act apply to the other. See Waddell v. Valley Forge Dental Assoc., Inc., 276 F.3d 1275, 1279 n. 3 (11th Cir.2001) (stating that Rehabilitation Act and ADA claims are analyzed under the same standard). Consequently, the same prima facie case applies to both.
To establish a prima facie case under the Rehabilitation Act, Plaintiff must show that: (1) he is disabled; (2) he was a qualified individual; and (3) he was discriminated against because of his disability. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir.2001). The parties primarily dispute whether Plaintiff was disabled and whether he was a qualified individual.

a. Whether Plaintiff was Disabled
Under the Rehabilitation Act, an individual is "disabled" if he: 1) has a physical or mental impairment that substantially limits one or more of his major life activities; 2) has a record of such an impairment; or 3) is regarded as having such an impairment. § 705(20)(B)(i)-(iii). Plaintiff asserts that he was regarded as having an impairment which substantially limited one or more major life activities. Although they specifically refer to employment relationships, *1388 EEOC regulations guide the analysis of whether a person is "regarded as having such an impairment." According to EEOC regulations, a plaintiff qualifies under the "regarded as" prong if he "(1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of the others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA." 29 C.F.R. § 1630.2(l). In addition, "the perceived impairment must be substantially limiting and significant." Gordon v. E.L. Hamm & Assoc., Inc., 100 F.3d 907, 913 (11th Cir. 1996). The "regarded as" prong was intended to "combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." Id. Plaintiff claims he was "disabled" because of Defendants' attitudes towards his impairment.
Plaintiff's case does not satisfy the "regarded as" prong. To begin with, Plaintiff has not identified a relevant "major life activity." Although the Rehabilitation Act does not define a "major life activity," EEOC regulations under the ADA provide examples. These activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2001). Plaintiff does not argue that Defendants' attitudes in any way inhibited his performance of such functions.
On a very general level, Plaintiff could argue that Defendants' reaction to his drug use prevented him from "learning" because he was expelled. However, this interpretation is far too broad and misses the point. "Major life activities" go to the core of a person's ability to function. Toyota Motor Mfg. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002). Plaintiff has never alleged that Defendants' attitudes prevented him from learning new concepts altogether. Instead, their decision to expel him limited only his ability to study dentistry. Plaintiff's proposed interpretation would expand the definition of "disability" to a point unjustified by the Rehabilitation Act. See Toyota 122 S.Ct. at 691. (holding that the term "major life activity" must be interpreted strictly to create a "demanding standard" for qualifying as disabled under the ADA).
Even if Plaintiff had identified a major life activity, he has produced no evidence of substantial limitation. In reality, Plaintiff maintains the ability to perform a wide variety of functions. Plaintiff may have difficulty pursuing a future in the dental profession. But Defendants' alleged attitudes do not constitute a substantial limitation on his ability to study dentistry if he were admitted some place else.
Defendants' decision to expel Plaintiff also does not reflect archaic attitudes about drug abuse. To the contrary, drug use is a serious societal problem. It is especially dangerous when the drug addict is administering medical care. Given the immense trust placed in members of the medical community, Defendants' actions were proper.

b. Whether Plaintiff was a Qualified Individual
Defendants further argue that Plaintiff was not a qualified individual because he was a "current" drug user at the time of his dismissal. The Rehabilitation Act states that "the term `individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use." § 705(20)(C)(i) (emphasis added). In other words, a public entity may discriminate against a person *1389 for current drug use even though his drug use would otherwise qualify him as an "individual with a disability." I will refer to this as the "current drug user rule." However, the Rehabilitation Act provides an exception to this rule if a person has entered or completed a "supervised rehabilitation program" and is no longer engaging in drug use. § 705(20)(C)(ii)(I)(II). If a person falls under this exception, he is not subject to § 705(20)(C)(i). Consequently, he is not considered a "current" drug user and not "exclude[d]" from being considered an individual with a disability. § 705(20)(C)(ii). When he was dismissed, Plaintiff claims was receiving treatment and no longer using drugs. Therefore, Plaintiff argues he was not a "current" drug user.
A brief factual summary provides the necessary temporal context. Plaintiff was confronted by the University Police on October 5, 1998. Two days later, he entered a drug rehabilitation program. At the time he enrolled in the program, Plaintiff was addicted to drugs. (Balogh Aff. ¶ 10.) On November 26, 1998, Defendant Butterbaugh sent Plaintiff a letter outlining the charges against him and informing Plaintiff of the upcoming disciplinary hearing. The hearing was held on January 26, 1999, and Plaintiff was dismissed the next day. When he was dismissed, Plaintiff claims he was participating in a drug rehabilitation program and no longer using drugs. Consequently, Plaintiff argues he may qualify as an "individual with a disability" under the exception to the current drug user rule.
The Rehabilitation Act does not define what constitutes current drug use, but other courts have interpreted the term to encompass a period much longer than the exact moment a drug user faces adverse action. See Zenor v. El Paso Healthcare Sys., Ltd., 176 F.3d 847, 856 (5th Cir.1999) (summarizing opinions where employees who used drugs "weeks and months" prior to termination were found to be "current drug users"); see also Shafer v. Preston Mem'l Hosp. Corp., 107 F.3d 274, 278 (4th Cir.1997) (stating that the employer need not discover the employee "needle-in-arm or bong-to-mouth" for the current drug user exclusion to apply). Without a broad interpretation of "current," a public entity's prerogatives would be severely restricted. As stated by the Fourth Circuit,
an employer wishing to investigate the circumstances of the employee's illegal drug use or to defer termination until a meeting of its personnel committee would be prevented from taking any employment action adverse to that employee.
Shafer, 107 F.3d at 278 (interpreting the same provision of the ADA). The same logic applies to a public university. Given the procedural protections afforded students facing disciplinary measures, see Goss v. Lopez, 419 U.S. 565, 581-83, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (ruling the Due Process Clause requires that a student receive notice and hearing before a temporary suspension), Congress could not have intended to bind public universities with a narrow definition of "currently." A substantial amount of time is needed to investigate allegations of drug abuse and to give a student adequate due process. For these reasons, I agree with the Fifth Circuit that the focus should be whether the university could reasonably believe that the plaintiff's substance abuse "remained an ongoing threat." Zenor, 176 F.3d at 857. Otherwise, a public entity would be forced to take hasty, and possibly unconstitutional, actions regarding drug users.
Despite the lapse in time between Plaintiff's enrollment in a rehabilitation program and his dismissal, I find that Plaintiff was a current drug user. Shortly before *1390 he entered the rehabilitation program, Plaintiff admitted to using drugs. (Butterbaugh Aff. ¶ 7.) In fact, Plaintiff obtained treatment only after being confronted about his drug use. (Pl.Aff.¶ 9.) Defendants considered disciplinary actions against Plaintiff shortly after discovering his addiction, and Plaintiff received notice of the charges less than seven weeks later. The hearing and dismissal occurred only two months from the time Plaintiff received this notice. Given the close proximity of time between the discovery of Plaintiff's addiction and his dismissal, MCG could reasonably conclude that Plaintiff's addiction remained a threat.
Even if Plaintiff were not considered a current user, his claim would fail. The safe harbor to the current drug user rule merely does not "exclude" rehabilitated addicts from being "an individual with a disability." § 705(20)(C)(ii). Consequently, a recovered addict must still prove he suffers from a disability which substantially limits a major life activity. Id.; § 705(20)(B). For reasons previously discussed, Plaintiff provides no evidence to support such a claim. He has alleged no significant limitation in performing a major life activity. Accordingly, Plaintiff's claim under the Rehabilitation Act is denied.

B. Federal Liability of the Individual Defendants in their Individual Capacities
In their individual capacities, Plaintiff claims Defendants violated his constitutional rights to substantive due process, procedural due process, and equal protection. In response, the individual defendants assert qualified immunity.
The Supreme Court prescribes a two-step analysis for determining qualified immunity. First, a court must view the facts most favorably to the plaintiff and decide whether plaintiff's allegations could establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If the plaintiff could not prove an infringement, "there is no necessity for further inquiries concerning qualified immunity." Id. If, however, a reasonable jury could find a constitutional violation, the plaintiff must show the right was clearly established in light of preexisting law. Id. References to abstract constitutional guarantees fail to satisfy this burden. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Instead, the plaintiff must point to previous decisions involving highly similar facts and the same constitutional right. Lassiter v. Ala. A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1150 (11th Cir.1994) (en banc). If precedent makes the unlawfulness of the defendant's actions apparent, then the law is clearly established. McMillian v. Johnson, 88 F.3d 1554, 1565 (11th Cir.1996). This precedent must come from the United States Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court. D'Aguanno v. Gallagher, 50 F.3d 877, 881 n. 6 (11th Cir.1995). Because I find that Plaintiff's allegations fail to establish a constitutional violation, the qualified immunity analysis ends after the first step.

1. Due Process
The Due Process Clause of the Fourteenth Amendment states "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. XIV, § 1. From this Clause, the Supreme Court has interpreted two forms of due process: substantive and procedural. McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir.1994). Plaintiff claims Defendants violated both forms.

a. Substantive Due Process
According to Plaintiff, attending dental school falls under the Due Process *1391 Clause's substantive component. The Supreme Court has developed two lines of analysis for determining the scope of substantive due process. First, substantive due process encompasses rights that are "implicit in the concept of ordered liberty." Palko v. Conn., 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). In other instances, substantive due process protects a plaintiff against actions which "shock the conscience." McKinney, 20 F.3d at 1556. Either way, courts are hesitant to expand the reach of substantive due process. Id. This reluctance applies especially when the alleged right was created by state law. "[A]reas in which substantive rights are created only by state law ... are not subject to substantive due process protection ... because `substantive due process rights are created only by the Constitution.'" Id. (quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J., concurring)).
Attending dental school does not entitle Plaintiff to substantive due process protection. Examples of fundamental rights include those protections explicitly outlined in the Bill of Rights. McKinney, 20 F.3d at 1556; see also U.S. Const. amend. I-X. In rare instances, the Supreme Court has extended such constitutional guarantees. See Griswold v. Conn., 381 U.S. 479, 482-86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (listing rights deemed fundamental but not mentioned in the Constitution and recognizing a right of privacy). I find that attending dental school is not a fundamental right. While dentists provide valuable services, their education is not "implicit in the concept of ordered liberty." Palko, 302 U.S. at 325, 58 S.Ct. 149. Second, Defendants actions do not "shock the conscience." Third, the State created the opportunity to attend dental school, not the Constitution. Accordingly, the individual Defendants are entitled to qualified immunity from Plaintiff's substantive due process claim.

b. Procedural Due Process
A person is not entitled to procedural due process unless he is deprived of an interest in life, liberty, or property. Bd. of Curators, Univ. of Mo. v. Horowitz, 435 U.S. 78, 84, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). According to Plaintiff, he has a liberty and property interest in attending dental school. Whether receiving postgraduate education rises to the level of a liberty or property interest is an unsettled question. See id. at 84-85, 98 S.Ct. 948. Moreover, state law determines whether receiving a dental degree is a property interest. Id. at 84, 98 S.Ct. 948. At this time, I will not resolve this issue because dismissing a public school student for disciplinary reasons raises special concerns. Accordingly, I will analyze whether Plaintiff received adequate procedural due process.
The level of process due depends on the circumstances. Sanctions for academic violations require less due process than disciplinary penalties. Id. at 86-87, 98 S.Ct. 948. Plaintiff was dismissed for disciplinary reasons. "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158 (5th Cir.1961). Dixon outlines the procedures which must be afforded to a student facing expulsion. The school must provide notice containing "the specific charges and grounds which ... would justify expulsion." Id. In addition, the school must hold "a hearing which gives the Board or administrative authorities of the college an opportunity to hear both sides in considerable detail." Id. at 159. Finally, the student "should also be given the opportunity to present to the Board, or *1392 at least an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf." Id. Nevertheless, the proceeding need not rise to the level of a "full-dress judicial hearing, with the right to cross-examine witnesses." Id.
The evidence shows that Plaintiff received more than adequate due process. Defendants sent Plaintiff written notification of the charges against him. (Butterbaugh Aff. Ex. A.) The same letter also named the adversary witnesses. (Id.) A hearing was held, and Plaintiff testified. (Pl.Aff.¶¶ 18, 21.) Plaintiff presented his own witnesses and questioned the opposition's witnesses. (Id. ¶ 21; Butterbaugh Aff. ¶¶ 16, 18.) Although Plaintiff was prohibited from bringing an attorney, Defendants allowed Plaintiff to have a representative. (Butterbaugh Aff. ¶ 17.) Given the circumstances, Defendants exceeded the procedural requirements of the Constitution.
Plaintiff attempts to undermine Defendants' procedures based on one allegation. Prior to the hearing, Dr. Butterbaugh allegedly informed Dr. Miller that Plaintiff would be dismissed. (Pl. Aff. ¶ 19; Balogh Aff. ¶ 22.) Dr. Miller purportedly relayed this statement to Plaintiff and Dr. Balogh, Plaintiff's treatment supervisor. (Pl. Aff. ¶ 19; Balogh Aff. ¶ 22.) Plaintiff claims this comment reveals a predetermined outcome and inadequate due process.
Contrary to Plaintiff's assertions, Butterbaugh's alleged comment fails to nullify the procedures employed by Defendants. At the hearing, Butterbaugh presented the evidence against Plaintiff. (Butterbaugh Aff. Ex. A.) However, a student judicial committee presided and found Plaintiff guilty of the charges. (Id.; Butterbaugh Aff. ¶ 20.) The judicial committee also recommended dismissal. (Butterbaugh Aff. ¶ 20.) Plaintiff presents no evidence that Butterbaugh took part in the ultimate decision to dismiss Plaintiff or that Butterbaugh improperly influenced the student judicial committee. Butterbaugh simply informed Plaintiff of the committee's decision through a letter. (Id. Ex. B.) Afterwards, Plaintiff had the opportunity to appeal the decision, but he chose not to. (Id. ¶ 22.) Under the circumstances, Defendants afforded Plaintiff substantial due process. For this reason, the individual Defendants receive qualified immunity from Plaintiff's procedural due process claim.

2. Equal Protection
Plaintiff maintains Defendants unlawfully discriminated against him. Because he does not fall within a suspect class under equal protection jurisprudence, Plaintiff must prove Defendants engaged in irrational and intentional discrimination. Smith v. State of Ga., 684 F.2d 729, 736 (11th Cir.1982). Plaintiff may prove intent with direct or circumstantial evidence. Burton v. City of Belle Glade, 178 F.3d 1175, 1189 (11th Cir.1999). As circumstantial evidence, Plaintiff may identify similarly situated individuals who received better treatment. Id. Even if Plaintiff introduces proof of intentional discrimination, he must also show the State had no rational justification for its actions. Garrett, 531 U.S. at 366-67, 121 S.Ct. 955. The State may discriminate against Plaintiff if it has a legitimate interest in doing so. Id. at 367, 121 S.Ct. 955. Additionally, the State need not articulate its interest at the time of the discrimination. Id. Instead, Plaintiff must show there is no "reasonably conceivable state of facts that could provide a rational basis for the [discrimination]." F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).
Plaintiff provides insufficient evidence to support an equal protection claim. Plaintiff *1393 relies solely upon circumstantial evidence. In his affidavit, Dr. Balogh vaguely states that other students with drug addictions have received more favorable treatment. (Balogh Aff. ¶ 20.) Plaintiff claims other students regularly allow their insurance to lapse. (Pl.Aff.¶ 27.) However, Plaintiff provides inadequate descriptive evidence for comparing these other students to him. For example, Plaintiff has not introduced evidence of another student being found guilty of drug abuse and falsifying documents but being allowed to stay. Without more specific examples, no reasonable jury could infer intentional discrimination.
Even if intentional discrimination could be inferred, Defendants had rational reasons for dismissing Plaintiff. First, a medical professional with a drug addiction poses a threat to the public. Second, a judiciary committee found him guilty of violating the student code. Third, Plaintiff violated the student code after his dismissal by possessing a loaded weapon in his University housing. (Butterbaugh Aff. ¶¶ 23-25.) Finally, Plaintiff faced allegations of drug trafficking. Plaintiff disingenuously notes that he was never indicted for the alleged trafficking and that he never received any drugs from his brother "upon his return from Mexico." (Pl. Aff.¶ 5.) Plaintiff does not deny, however, that he and his brother attempted to transport illegal narcotics from Mexico to the United States. For these reasons, Plaintiff has failed to show the absence of a rational basis for the alleged discrimination. Defendants had a significant interest in dismissing Plaintiff from dental school. Accordingly, the individual Defendants are entitled to qualified immunity from Plaintiff's equal protection claims.

C. State Law Claims
Plaintiff brings state-law claims for violations of the Georgia Constitution, intentional infliction of emotional distress, and breach of contract. Plaintiff does not discuss the Georgia constitutional claims in his brief. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.1995) (en banc). Accordingly, Plaintiff has abandoned his state constitutional claims. This leaves Plaintiff's tort and contract claims. For purposes of summary judgment, I will assume this Court has jurisdiction over these claims.

1. Tort Claim
Plaintiff asserts tort claims against Defendant Board of Regents and the individual Defendants. With regard to the individual Defendants, the Georgia Code provides that "[a] state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor." O.C.G.A. § 50-21-25(a). Plaintiff has not alleged that the individual Defendants acted outside the scope of their official duties. Accordingly, Plaintiff's tort claim against the individual Defendants is denied.
Because Plaintiff has not followed the proper procedures for bringing suit against the State, Defendant Board of Regents also is entitled to summary judgment. A plaintiff must give the State notice of a tort claim before filing a lawsuit. Id. § 50-21-26. The burden is on the plaintiff to show he provided such notice. Id. § 50-21-26(a)(4). Plaintiff has introduced no evidence of satisfying this requirement. Accordingly, his tort claim against the Board of Regents is denied.

2. Contract Claim
Plaintiff alleges that an "implied contract" existed between himself and the *1394 Board of Regents regarding his education. (First Amended Complaint, Count XXII.) The Board of Regents, however, is entitled to sovereign immunity from this claim. The State is only subject to a lawsuit for breach of contract if the contract is in writing. Id. § 50-21-1(a); Bd. of Regents of the Univ. Sys. of Ga. v. Tyson, 261 Ga. 368, 369, 404 S.E.2d 557 (1991). An "implied" contract does not satisfy this requirement. Accordingly, the Board of Regents is entitled to summary judgment on this claim.

V. Conclusion
Plaintiff has shown insufficient grounds for granting a continuance. Plaintiff has had ample grounds to raise his defense to Defendants' motion for summary judgment. Accordingly, Plaintiff's Motion for a Continuance (Doc. No. 35) is DENIED. Plaintiff's Motion to Exceed the Twenty Five Page Limit (Doc. No. 32) is GRANTED. Finally, Defendants' motions for summary judgment (Doc. Nos.17, 25) are GRANTED.
ORDER ENTERED at Augusta, Georgia, this 29th day of March, 2002.